# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **DR. LAURA BAUM-HOLLAND, et al,** | **CIVIL NO. 14-1860 (DRD)** |
| Plaintiffs, | |
| v. | |
| **EL CONQUISTADOR PARTNERSHIP, L.P., S.E., d/b/a EL CONQUISTADOR RESORT, et al.,** | |
| Defendants. | |

## OPINION AND ORDER

Pending before the Court is co-defendants Hilton El Con Management LLC, Hilton El Con Operator LLC, El Conquistador Partnership L.P., S.E. d/b/a El Conquistador Resort, and LXR Luxury Resorts' (hereinafter, "El Conquistador") *Motion for Summary Judgment* (Dkt. No. 127)[1]. Plaintiff filed its respective opposition to said motion. (Dkt. No. 138).

For the reasons stated herein, the Court **GRANTS** El Conquistador's motion for summary judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The instant case arises from the death of Dr. George Holland, which happened on January 1, 2013 while vacationing in Puerto Rico. Dr. Holland arrived to Puerto Rico for a vacation with family and friends on or around December 26, 2012 for his mother-in-

---

[1] El Conquistador submitted a *Supporting Statement of Material Facts. See* Dkt. No. 127-1.

law's 75th birthday and New Year's Eve celebration. During their visit, the group stayed at El Conquistador, located in Fajardo, Puerto Rico.

On January 1, 2013, Dr. Holland, his wife Dr. Laura Baum-Holland, and his three children took El Conquistador's ferry to Palomino[2] with other members of the party. *See* Third Amended Complaint, Dkt. No. 70, ¶ 20. Upon their arrival to Palomino, Dr. Holland and other party members rented snorkeling equipment from La Casa del Mar. *Id.* at ¶ 21. The party proceeded to snorkel towards Palominito.[3] About half way towards Palominito, Dr. Holland became unresponsive, prompting Plaintiffs' witnesses, Lisa Kaye and Lawrence Evan Jassin to approach Dr. Holland. After several attempts to save Dr. Holland's life, including a transfer to a hospital nearby, was officially pronounced dead.

Plaintiffs' Dr. Laura Baum-Holland, widow of deceased Dr. Holland, daughters Sarah and Emily Holland[4] and, son Joseph Holland filed the instant diversity claim against El Conquistador for damages and eventual death of Dr. Holland.

El Conquistador is seeking summary judgment (Dkt. No. 127), alleging that the vast majority of the critical allegations contained in plaintiffs' Third Amended Complaint fail in truthfulness and thus the summary judgment is warranted dismissing all claims premised therein. El Conquistador avers that the remainder of the allegations concern

---

[2] "Isla Palomino is a small, uninhabited island located to the east of Puerto Rico, near the coast of Las Croabas, Fajardo." "Isla Palomino". 2018. https://en.wikipedia.org/wiki/Isla_Palomino. (26 September 2018).

[3] "Palominitos Island (Isla Palominitos) is a small cay about 4 miles east of Fajardo." "Is Palominitos Island Disappearing?" 2018. http://www.puertoricodaytrips.com/palominito-island/. (26 September 2018.

[4] Although when the complaint was initially filed Sara and Emily Holland were minors, Sarah and Emily reached the majority of age on August 29, 2016 and November 9, 2013, respectively.

omissions for which there was no duty to act, and consequently summary judgment is warranted dismissing such claims. *See* Dkt. No. 127, p. 19. El Conquistador is further requesting summary judgment in favor of co-defendants, Hilton El Con Management, LLC and Hilton El Con Operator, LLC, as they do not own or operate El Conquistador. They are also seeking summary judgment in favor of LXR Luxury Resorts, which they allege is not an actual entity. Plaintiffs have filed their opposition to said motions (Dkt. No. 138). The Court will focus on allegations against El Conquistador moving hereafter. Proper analysis of the parties' motions require careful scrutiny of the underlying legal framework.

## II.     FACTUAL FINDINGS

The following factual findings are taken from the parties' statements of undisputed facts, and supported documentation. Upon careful review of the record, the Court finds the following facts are undisputed:

1.      This action arises from an incident that took place on January 1, 2013, at or off the coast of Palomino Island in Puerto Rico. *See* Third Amended Complaint, Dkt. No. 70 ¶¶ 11, 40.

2.      The third amended complaint alleges plaintiffs visited Palomino Island as guests of El Conquistador Resort, where they were staying since on or about December 26, 2012. *Id.* at ¶¶ 12-20.

3.      Since several years before December of 2012 and until today, El Conquistador has been owned and operated by El Conquistador Partnership LP SE. *See*

Dkt. No. 127-2, Exhibit A, Unsworn Declaration Under Penalty of Perjury by Noel Vera-Ramírez. ¶ 2.

4.      As it pertains to Hilton El Con Management LLC and Hilton El Con Operator LLC, the Third Amended Complaint alleges "Hilton El Con Management L.L.C. and/or Hilton El Con Operator, L.L.C., are limited liability companies incorporated in the state of Delaware, authorized to do business in Puerto Rico, with principal offices in Beverly Hills, California, and in 1000 El Conquistador Ave., Las Croabas, Fajardo, Puerto Rico. Upon information and belief, these co-defendants manage and/operate El Conquistador." *See* Dkt. No. 70 ¶ 6.

5.      Since at least as early as December of 2012 and to this date, Hilton El Con Management LLC has not owned or operated the El Conquistador Resort, nor has it provided any service to guests therein. *See* Dkt. No. 127-2 ¶ 3.

6.      Hilton El Con Management LLC and El Con Operating LLC ("Hilton") have been authorized to do business in Puerto Rico since December 15, 2008. *See* Dkt. Nos. 138-5 and 138-6.

7.      Said entities filed annual reports with the Department of State of Puerto Rico, at least until 2013, which is the year when the incidents alleged in the complaint took place. *See* Dkt. No. 138-6 and 138-7.

8.      Since at least as early as December of 2012 and to this date, Hilton El Con Operator LLC has not owned or operated the El Conquistador Resort, nor has said party provided any service to guests therein. *Id.* ¶ 4.

9. As it pertains to LXR Luxury Resorts, the third amended complaint alleges, "LXR Luxury Resorts, Inc. is a corporation incorporated in the state of Delaware, with principal offices in 501 East Camino Real, Boca Raton, Florida, that upon information and belief owns and/or operates El Conquistador. *See* Dkt. No. 70, ¶ 7.

10. LXR Luxury Resorts is not an entity, but rather, is a trademark owned by LXR Holdco, Inc. that El Conquistador Partnership LP SE used under license. *See* Dkt. No. 127-2, ¶ 5.

11. Since at least as early as December of 2012 and to this date, there has been no entity named LXR Luxury Resorts that has owned or operated the El Conquistador Resort, or has provided any service to guests therein. *Id.*, ¶ 6.

12. Zurich American Insurance Company ("Zurich") "is the insurer of El Conquistador Partnership L.P., S.E., d/b/a El Conquistador Resort." *See* Dkt. No. 79, ¶ 10.

13. On January 1, 2013, Dr. Holland rented snorkeling gear from concessionaire, La Casa del Mar for him and his son, Joseph, as well as for some other members of his party. *See* Dkt. No. 138-13.

14. Pursuant to the Concession Agreement, La Casa del Mar is a concessionaire to El Conquistador that rents snorkel equipment to the hotel guests that visit Palomino Island. *See Concession Agreement by and Between El Conquistador Partnership L.P., S.E. d/b/a El Conquistador Golf Resort & Casino and La Casa del Mar, Inc. d/b/a La Casa del Mar Dive Center*, Dkt. No. 142-4.

15. The rental of the snorkeling equipment was charged to Dr. Holland's room as El Conquistador's guest. *See* Dkt. No. 138-13.

16. Dr. Holland signed the La Casa del Mar Snorkeling Liability and Release Policy. *See* Dkt. No. 58, *Motion Informing Stipulation of Fact.*

17. When Dr. Holland rented the snorkel equipment, he did not request an available floatation device from the equipment rented to the guests by the concessionaire, La Casa del Mar. *See* Dkt. No. 70 ¶ 21.

18. Dr. Holland did not rent any snorkeling belts. *Id*.

19. The La Casa del Mar rental concession stand had flotation belts available for rental to snorkelers for a charge of $5.00, and which were hanging behind the counter visible to the public. *Id.* at p. 27, l. 3-23, p. 60, l. 4-17.

20. Lyzette Morgan Guzmán, La Casa del Mar's employee in charge of renting snorkeling equipment during the date of the incident, attested that people do not rent the belts often. *See* Ms. Morgan's Deposition, Dkt. No. 127-6, p. 36 l. 6-8.

21. According to Ms. Morgan, belts were typically rented for kids. *Id.* p. 42 l. 20-22.

22. Ms. Morgan further testified that there were 12-15 belts available to rent on the date of loss. *Id.* p. 58, l. 5-10.

23. According to the equipment rental log contained in the release, 2 "velts" (belts) were rented after Dr. Holland rented the equipment for his party. *See* Exhibit A, Dkt. No. 58-2; *see also* Ms. Morgan's Deposition, Dkt. No. 127-6, p. 27 l. 3-23.

24.    Ms. Morgan, would routinely advice guests that the best snorkeling area was between Palomino and Palominito. *See* Ms. Morgan's Deposition, Dkt. No. 127-6, p. 86, l. 16-19.

25.    According to Ms. Morgan, she was told by Palomino Water Sports' personnel that the swim from Palomino to Palominito could take between 30 to 45 minutes and that was what she would routinely advice guests when asked. *See Ms. Morgan's Unsworn Declaration Under Penalty of Perjury*, Dkt. No. 141-9, ¶ 28.[5]

26.    Plaintiffs retained an expert in oceanography, Dr. Miguel Canals Silander, who has a master's degree in oceanography and a Ph.D. in ocean engineering. *See* Dr. Canals' Deposition, Dkt. No. 127-3, p. 8 l. 18 to p. 9, l. 1.

27.    Dr. Canals was hired to reconstruct of the oceanographic conditions at and around the time of Dr. Holland's death on January 1, 2013, to take a picture, or a reconstruction of what was happening, in terms of waves, the winds, and the currents, at the time of the incident by plaintiffs. *Id.* at p. 29, l. 2-11.

28.    While Dr. Holland was snorkeling, the wind speed in the area would have been between 5 and 12 miles per hour, which are typical trade wind conditions for the area in Puerto Rico. *Id.* at p. 51, l. 6-7; p. 76 l. 23 to p. 77, l. 2.

29.    In addition, a "small westward flow" of water was caused by the tide dropping. *Id.* at p. 52, l. 10-15.

---

[5] Palomino Water Sports is not a defendant in the instant case.

30.     The National Weather Service issued a coastal hazard notification warning on January 1, 2013 indicating "large breaking waves and frequent rip currents resulting in dangerous surf conditions affecting the Atlantic coastlines of Puerto Rico." *See* Dkt. No. 141-1.

31.     The National Weather Service advised of waves and surf "7 to 9 foot north-northwest swells in breaking waves of 10 to 14 feet and locally higher." *Id.*

32.     Dr. Canals stated there was a weather bulletin that estimated the height of the breaking waves between 10 to 14 feet, but this bulletin is for a completely different location than the area Dr. Canals analyzed between Palomino and Palominito. *See* Dkt. No. 127-3, p. 108, l. 10-25.

33.     On January 1, 2013, at the time and the place of the incident, the conditions that Dr. Canals estimated were drastically different from what was described in the weather bulletin as these facts occurred in the Southern side of Palomino in route to Palominito. *Id.* at p. 109, l. 9-20.

34.     The reason the oceanographic conditions in the bulletin are different in the exposed Atlantic to the north than those in the Palomino-Palominito area is because there is a barrier of islands and reefs to the north of Palomino, and the waves interact with the local bathymetry of Palomino and Palominito, which is a sheltered environment, and which includes a reef area directly around the north and eastern coast of Palomino Island that further reduces wave energy. *Id.* at p. 61 l. 1 to p. 63, l. 2.

35.     In sum, while the weather bulletin estimated the height of the breaking waves between 10 to 14 feet in the exposed Atlantic, Dr. Canals estimated that the waves

between Palomino and Palominito were maybe one to two foot waves. *Id.* at p. 60, l. 11-21; 84, l. 11-19.

36.     This is the result of waves approaching the barrier of islands and reefs located to the north of Palomino resulting in "wave dissipation" and as a result, "the lee of Palomino and Palominito" results in a sheltered environment. *Id.* at p. 61, l 16 to p. 62, l. 6.

37.     The tidal change on that day over a 12-hour period was approximately 1 foot, with 1 foot to two feet being typical for the northeastern coast of Puerto Rico. *Id.* at p. 53 l. 18-21, p. 56 l. 22 to p. 57, l. 3.

38.     The westward current in the area between Palomino and Palominito was between 0.3 to 0.45 or between 0.6 and 0.9 knots. *Id.* at p. 64, l. 8-12.

39.     The maximum 0.9 knots current is a longshore current, which is a current that runs parallel with the coast. *Id.* at p. 105 1 to p. 106, l. 25. The current was not a rip current. *Id.* at p. 106, l. 23-24.

40.     That same day, Dr. Holland began swimming towards a small island (Palominito) located approximately ½ a kilometer away from Palomino. *See* Dkt. No. 70, ¶ 27.

41.     Dr. Holland was about half way to Palominito when the incident occurred. *See* Dkt. No. 70 ¶ 28*; see also* Dkt. No. 127-11 p. 77.[6]

---

[6] Exhibit No. 7 from Mr. Jassin's Deposition and Exhibit 6 from Mrs. Jassin's Deposition wherein Mr. Jassin made an outline of the parties' location when the incident occurred on a Google Maps satellite view of Palomino and the adjacent island. According to Mr. Jassin, point 2 was the route they took from Palomino to Palominito, and point 3 was the approximate location where Mr. Holland became unresponsive.

42.     John Rosado, the owner of Palomino Water Sports, another of El Conquistador's concessions, also testified that on the day and time of the incidents there were strong currents. *See* Deposition of Mr. Rosado, Dkt. No. 141-7, p. 30 l. 4-6, p. 32 l. 13-25, p. 99 l. 12-25.

43.     As they were trying to rescue Dr. Holland, Mr. Rosado described the current as follows:

> "Well, when I get over, José Caraballo jumped in the water to assist Edward, to see what was the situation. Both of them they do have the lifeguard license, so they just jump in. Uhhh, they tried to pull him over on the jet ski, with the current, and it was really hard, because they would keep dragging, and dragging with the current." *Id.*, p. 36, l. 16-22.

44.     Dr. Richard Baum is plaintiff, Laura Baum Holland's brother. *See* Dkt. No. 140, *Deposition of Dr. Richard Baum*, p. 23, l. 4-8.

45.     On the day of the incident, Dr. Richard Baum heard that Dr. Holland was in trouble, so he went and asked an employee with a Jet Ski to take him where the problem with Dr. Holland was occurring. *Id.* p. 26, l. 14-17, p. 27, l. 8-16, p. 28, l. 10-16.

46.     The employee went with Dr. Richard Baum, who was on the back of the Jet Ski, and the employee indicated that the person in trouble was on a sailboat. *Id.* p. 29, l. 1-8 and 19-25.

47.     Once the employee and Dr. Baum arrived near the sailboat, they saw his family and co-plaintiff Joseph Holland "kneeling around Dr. George Holland". *Id.* p. 30, l. 1-14.

48.     Dr. Richard Baum went on the sailboat and kept monitoring Dr. Holland's vital signs, while Dr. Baum's wife administered Cardio Pulmonary Resuscitation ("CPR") to Dr. Holland. *Id.* p. 32, l. 9-12 and p. 32, l. 22 to p. 39, l. 11-17.

49.     Dr. Baum noticed that Dr. Holland's pulse remained faint with a shallow respiration until he was brought to shore and that Dr. Holland lost his respiration and pulse on shore. *Id.* p. 43, l. 14-18, p. 44, l. 11-13.

50.     Mr. Jassin, another observing witness, stated that while the party was snorkeling, they agreed to stay together and were virtually together the whole time. *See Mr. Jassin's Deposition*, Dkt. No. 127-10 p. 68 l. 23-25.

51.     According to Plaintiffs' witness, Lisa Kaye Jassin, while swimming, Dr. Holland was looking straight towards Palominito, was calm, not trashing, and was treading water.[7] *See* Mrs. Jassin's Deposition, Dkt. No. 127-11, p. 25 l. 9 to p. 26, l. 16; p. 30 l. 6-10.

52.     According Mrs. Jassin, during the expedition, facing Palominito, Dr. Holland was to her left, about 12 feet away from her. *Id.* p. 17 l. 17 to p. 24 l. 9.

53.     Mr. and Mrs. Jassin approached Dr. Holland out of concern as Dr. Holland had become unresponsive. *Id.* at p. 25, l. 9-22; *see also* Mr. Jassin's Deposition, Dkt. No. 125-10, p. 92, l. 3-22.

54.     Shortly after Dr. Holland became unresponsive, Mr. and Mrs. Jassin pulled and held him up. *See* Mrs. Jassin's Deposition, Dkt. No. 127-11, p. 27, l. 18-23.

---

[7] To tread water is "to float with your head above the water's surface and your feet below you by moving your legs and arms up and down." "Tread water". 2018. https://dictionary.cambridge.org/us/dictionary/english/tread-water. (26 September 2018).

55.     Mr. and Mrs. Jassin testified that the day was partly cloudy and breezy, that the water was choppy and not smooth and that there were currents (Dkt. No. 127-11, p. 69, l. 22-24 to p. 70, l. 1-7, and Dkt. No. 127-10, p. 28, l. 14-23, p. 41, l. 14-17) that made them shift to the right (*Id.* p. 43, l. 13-18), thus they had to keep looking at Palominito to keep track because the current was moving them to the side (*Id.* p. 44, l. 1-18) and that it got harder as they went along (*Id.* p. 60, l. 2).

56.     Mr. Jassin also testified that before Dr. Holland was lifted from the water he drifted from point 3 to point 4 (in the photograph, Dkt. 127-11, p. 77)[8] because of the current (Dkt. No. 125, p. 96, l. 10-24 and p. 97, l. 1-2) and that after Dr. Holland was placed aboard the catamaran he had to struggle and drifted away from the catamaran because of the choppy water and the current. *Id.* p. 144, l. 22-23, p. 145, l. 1-24, p. 147, l. 1-24.

57.     Mr. Jassin testified that he did not see any flag in Palomino warning as to the sea conditions on January 1. 2013. *Id.* p. 137, l. 23-24 to p. 138, l. 1-3.

58.     However, according to Mrs. Jassin, there was no undertow pulling the swimmers down, no waves tossing people around, and no one was getting tossed in the waves or getting thrown under water. *See* Dkt. No. 127-11, p. 28, l. 23 to p. 29, l. 10.

59.     Mrs. Jassin testified under oath that she has lifeguard, CPR and AED training. *Id.* p. 4 l. 25 to p. 8 l. 8.

60.     Prior to noticing Dr. Holland stopped treading water and looking at Palominito Island, there was nothing about the water conditions that merited the

---

[8] Enclosed herein as Exhibit I to orient the reader of this opinion.

attention of Mrs. Jassin or the party, including two (2) young boys, turning back to shore. *Id.* at p. 55, l. 13 to p. 56, l. 2.

61.    After becoming unresponsive, Dr. Holland later began foaming at the mouth. *Id.* at p. 27, l. 15-17; *see also* Mr. Jassin's Deposition, p. 94, l. 15-20.

62.    Between the times Mrs. Jassin first observed Dr. Holland, vertical treading water staring at Palominito, until the time he started foaming at the mouth, his head was kept above water. *Id.* at p. 33, l. 15 to p. 34, l. 7.

63.    After Dr. Holland was brought to shore, Dr. John Ruge, a neurosurgeon of 27 years of experience, saw a nurse or some other person tending to him, walked over to Dr. Holland and continued providing CPR. *See* Dr. Ruge's Deposition, Dkt. No. 127-8, p. 4, l. 11 to p. 7, l. 3.

64.    As he approached Dr. Holland at shore, he first assessed Dr. Holland's condition and found that he was dead, totally cyanotic, blue. He was also pulseless and breathless. *Id.*, p. 6, l. 19 to p. 7 l. 13.

65.    There was a female nurse at shore assisting Dr. Holland, together with Dr. Melinda Armacost, a dentist, certified in Cardio Pulmonary Resuscitation ("CPR"), who provided CPR with chest compressions and mouth-to-mouth respiration to Dr. Holland. *See* Dr. Melinda Armacost's Deposition, Dkt. No. 144-1, p. 13, l. 5, p. 18, l. 11-12, p. 19, l. 13-17, p. 30, l. 20-22, p. 31, l. 22.

66.    An Automatic Emergency Defibrillator (hereinafter, "AED") was brought to the scene, which Dr. Ruge applied following the AED instructions. *See* Dkt. No. 127-8, p. 7, l. 21 to p. 8, l. 22.

67.     While Dr. Armacost administered CPR to Dr. Holland, he expelled liquid and some kind of chunk content in various instances, in one of them, almost a liter. *Id.* p. 33 l. 24 to p. 36 l. 7.

68.     Once Mr. Holland was brought to shore, the scene was chaotic and no one from the hotel was in charge, so Dr. Holland had to receive assistance and CPR from other hotel guests. *Id.*, p. 18 l. 19 to p. 19 l. 7, p. 37 l. 9 to p. 38 l. 18.

69.     The defibrillator or AED was brought by a hotel staff member, within ten (10) minutes. *Id.*, p. 33, l. 16-18.

70.     Eventually Dr. Holland was loaded on a utility beach vehicle and transported onto a police boat, this approximately 35 to 40 minutes after he arrived to shore. *Id.* p. 32 l. 15 to p. 33 l. 15.

71.     Once at the hotel, Dr. Holland was transported by ambulance to a hospital where he was officially pronounced dead. *Id.* at ¶ 40.

72.     Plaintiffs retained Alberto Marti Ruiz, a dive center and water sports concession operator. *See* Mr. Marti's Deposition dated 7-20-2016; Dkt. No. 127-4, p. 7, l. 4 to p. 8, l. 11.

73.     Plaintiffs' Liability Expert is Mr. Marti, is a certified scuba diver. He owns Scuba Dogs, a concession located in Escambrón Beach, San Juan, that among other things, rents out snorkeling gear. *Id.* at p. 7, l. 3 to p. 8, l. 11; p. 53, l. 15 to p. 56, l. 10.

74.     A floatation vest is not mandatory on Mr. Marti's snorkel rentals. *Id.* at p. 64.1, l. 11-13

75.     Mr. Marti has never made float vests mandatory for customers renting snorkeling equipment. *Id.*, p. 64, l. 17-19.

76.     Mr. Marti confirmed there was no rule, law or regulation requiring the use of floatation devices on January 1, 2013. *Id.* at p. 48, l. 2-7.

77.     Mr. Marti further confirmed floatation devices were optional for the customers renting from his snorkel concession stand in January 1, 2013. *Id.* at p. 48, l. 7-19.

78.     Mr. Marti has never made float vests mandatory for customers renting snorkeling equipment. *Id.* at l. 17-19.

79.     At the time of the incident, there was no rule or regulation that required a snorkeling rental business to provide snorkeling vests to customers. *Id.* at p. 64, l. 23 to 65, l. 1.

80.     When renting a package of snorkeling gear, the snorkeling vest is optional and many times people do not need it. It is a personal preference of the customer. *Id.* at p. 67, l. 4-14.

81.     There is no rule, law, regulation or standard that requires a snorkeling equipment rental concession to provide an inflatable vest or life jacket to snorkelers. *Id.* at p. 55, l. 17 to p. 58, l. 1.

82.     There is no rule, law, regulation or standard that requires a snorkeling equipment rental concession to provide a rescue tube or board as added floatation device to assist divers. *Id.* at p. 55, l. 17 to p. 58, l. 20.

83.     There is no rule, law, regulation or standard that requires a snorkeling equipment rental concession to provide a "safety sausage"[9] to renters of snorkeling equipment. *Id.*

84.     There is no rule, law, regulation or standard that requires a snorkeling equipment rental concession to provide a reflecting mirror or a whistle to alert authorities in the event of distress.  *Id.*

85.     Mr. Marti understands that currents of 1.5 to 2 knots are difficult for somebody to safely enjoy snorkeling. *See Id.* p. 127, l. 10-17.

86.     As stated in paragraph 21, Dr. Canals was hired to perform a reconstruction of the oceanographic conditions at and around the time of Dr. Holland's death on January 1, 2013, to provide a picture, or a reconstruction of what was happening, in terms of waves, the winds, and the currents, at the time of the incident. *See* Dr. Canals' Deposition, Dkt. No. 127-3, p. 29, l. 2-11.

87.     Dr. Canals is of the opinion that on January 1, 2013, Dr. Holland experienced currents of .6 to .9 knots at the site of the accident. *Id.* at p. 64, l. 8-22; pp. 89-90, l. 22-13.

88.     For over eight years, Edward Valentín Lugo has worked as a beach attendant at Palomino Island. *See* Mr. Valentín's Deposition, Dkt. No. 127-7, p. 9 24 to p. 10, l. 7.

---

[9] A bright color device that is used to get attention if lost at sea or when an accident happens while at sea. *See* "SMB And DSMB: Identifying Your Marker Buoys" 2018.  http://www.fivein.com/guide/what-is-a-dsmb. (26 September 2018).

89.     Prior to working at Palomino, Mr. Valentín worked in search and rescue with the State Emergency Management, which provided him with specialized training in life rescue. *Id.* at p. 8, l. 24 to p. 9, l. 16.

90.     Mr. Valentín has been Red Cross certified lifeguard since at least 2012, which includes training in aquatic rescue and CPR. *Id.* at p. 7, l. 24 to p. 8, l. 5.

91.     El Conquistador is who set up the classes with the Red Cross. *Id.* at p. 8, l. 6-13.

92.     Dr. Francisco Cortés Rodríguez is a forensic pathologist who performed an autopsy on Dr. Holland on January 2013. *See* Dr. Cortés' Deposition, Dkt. No. 268-1, p. 5, l. 15-20, p. 8, l. 13-18; *see also Medical Examiner's Report,* Dkt. No. 141-3.

93.     Dr. Holland's diagnostic summary as contained in Dr. Cortes' Medical Examiner's Report was: (1) aspiration of water in the sphenoid; (2) pulmonary edema; (3) cardiomegaly, 560 grams; (4) hepatomegaly, 3,080 grams; splenomegaly, 420 grams; (5) generalized cerebral edema and visceral congestion and; abrasions on the face. *See* Dkt. No. 141-3, p. 4.

94.     Dr. Cortés found that Dr. Holland's cause of death was asphyxia by drowning with a contributing factor being an arteriosclerotic coronary disease. *Id.*

95.     According to Dr. Cortés' report, Dr. Holland's demise was an accident. *Id.*

96.     During his deposition, Dr. Cortés explained that a death by drowning, you have to eliminate other causes of death. You can drown in six inches of water; you can drown in an ocean. Just the mere presence of water in the lungs is not sufficient to diagnose death by drowning. If you find water in the sphenoid sinus, then you have a

good idea that this person drowned or at least that he aspirated water. *See Dr. Cortés'*

*Deposition*, Dkt. No. 268-1, p. 16, l. 21-25, p. 17, l. 8-11.

97.     During the autopsy, Dr. Cortes' found that Dr. Holland suffered from hypertension that was not being treated. *Id.* p. 30, l. 15-25.

98.     According to Dr. Cortés, Dr. Holland had an enlarged heart weighing 560 grams because of his untreated hypertension. *Id.* p. 60, l. 8-13.

99.     According to Dr. Cortés, Dr. Holland's heart was almost twice the size of a normal heart, and he also had thickened blood ventricle. *Id.* p. 66, l. 20-21.

100.    Dr. Cortés further found that Dr. Holland suffered from slight atherosclerosis. *Id.* p. 63, l. 7-15.

101.    Dr. Cortés' also found that Dr. Holland had a markedly enlarged liver weighing 3,080 grams, while a liver normally weighs 1600 grams.[10] It was brownish-yellow, and of hinged consistency, consistent with fatty liver. *Id.* p. 67, l. 24-25 to p. 68, 1-2, p. 70 l. 7-12.

102.    Dr. Holland's body measured 70 inches in stature. And he was in an obese nutritional state at the time of his death, weighing 240 pounds. *Id.* p. 50, l. 9-10; *see also* Dkt. No. 141-3.

103.    Dr. Cortés further explained that a person foaming at the mouth is indicative of pulmonary edema.  *Id.* p. 33, l. 12-25.

---

[10] Dr. Holland's liver was 1480 grams larger than a normal liver.

104.    According to Dr. Cortés, there are no pathognomonic[11] specific changes that indicate specifically drowning. *Id.* p. 57, l. 19-25.

105.    Dr. Cortés further testified that by drawing the conclusion of drowning as a cause of death he could not rule out that Dr. Holland suffered a heart attack. *Id.* p. 73, l. 19-22.

### III.    LEGAL STANDARD

***Motion for Summary Judgment Standard (Fed. R. Civ. P. 56)***

A motion for summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure, which entitles a party to judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *See* Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013); *Prescott v. Higgins*, 538 F.3d 32, 40 (1st Cir. 2008) (citing *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986); *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).    The analysis with respect to whether or not a "genuine" issue exists is directly related to the burden of proof that a non-movant would have in a trial.    "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby, Inc.*, 477 U.S. at 255 (applying the summary judgment standard

---

[11] "Distinctively characteristic of a particular disease or condition." "Pathognomonic". 2018. https://www .merriam-webster.com (6 April 2018).

while taking into account a higher burden of proof for cases of defamation against a public figure). In order for a disputed fact to be considered "material" it must have the potential "to affect the outcome of the suit under governing law." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–661 (1st Cir. 2000) (citing *Liberty Lobby, Inc.*, 477 U.S. at 247–248); *Prescott*, 538 F.3d at 40 (1st Cir. 2008) (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The objective of the summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (citing the advisory committee note to the 1963 Amendment to Fed. R. Civ. P. 56(e)). The moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact on the record. *Shalala*, 124 F.3d at 306. Upon a showing by the moving party of an absence of a genuine issue of material fact, the burden shifts to the nonmoving party to demonstrate that a trier of fact could reasonably find in his favor. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The non-movant may not defeat a "properly focused motion for summary judgment by relying upon mere allegations," but rather through definite and competent evidence. *Maldonado–Denis v. Castillo Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994). The non-movant's burden thus encompasses a showing of "at least one fact issue which is both 'genuine' and 'material.'" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990); *see also Suarez v. Pueblo Int'l.*, 229 F.3d 49, 53 (1st Cir. 2000) (stating that a non-movant may shut down a summary judgment motion only upon a showing that a trial-worthy issue exists). As a result, the mere existence of "some alleged factual dispute between the parties will not

affect an otherwise properly supported motion for summary judgment." *Liberty Lobby, Inc.*, 477 U.S. at 247–248. Similarly, summary judgment is appropriate where the nonmoving party rests solely upon "conclusory allegations, improbable inferences and unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir. 1996); *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

When considering a motion for summary judgment, the Court must "draw all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." *Smith v. Jenkins*, 732 F.3d 51, 76 (1st Cir. 2013) (reiterating *Shafmaster v. United States*, 707 F.3d 130, 135 (1st Cir. 2013)). The Court must review the record as a whole and refrain from engaging in the assessment of credibility or the gauging the weight of the evidence presented. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (quoting *Anderson*, 477 U.S. at 250–51).

Summarizing, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact **and the movant is entitled to judgment as a matter of law.**" (Emphasis provided). *See* Fed. R. Civ. P. 56(a).

Hence, in order to prevail, Defendants must demonstrate that, even admitting well-pleaded allegations in light most favorable to Plaintiffs, the applicable law compels a judgment in its favor.

# IV.    LEGAL ANALYSIS

## A.    *Negligence under Article 1802 of the Puerto Rico Civil Code*

The determinative issue in the Court's analysis is whether the January 1, 2013 incident in Palomino Island, which resulted in Dr. Holland's death, is the result of a breach of duty of care by Defendants. Article 1802 states that "a person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 P.R. Laws Ann. § 5141. Under Article 1802, a plaintiff suing for personal injuries must plead, and ultimately prove, four elements: 1) a duty requiring the defendant to conform to a certain standard of conduct; 2) a breach of that duty; 3) proximate cause; and 4) damages. *Coyne v. Taber Partners I*, 53 F.3d 454, 459-462 (1st Cir. 1995); *Woods-Leber v. Hyatt Hotels of P.R.*, 124 F.3d 47, 50 (1st Cir. 1997). "These requirements cannot be satisfied unless the plaintiff proves that the injury was reasonably foreseeable, and, thus, could have been avoided had the defendant acted with due care." *Woods-Leber*, 124 F.3d at 50-51. Therefore, to recover on a theory of negligence, Plaintiff must show that the negligent acts or omissions of El Conquistador were the proximate cause of Dr. Holland's injuries and eventual demise. *Malave-Felix v. Volvo Car Corp.*, 946 F.2d 967 (1st Cir. 1991)(stating that Puerto Rico defines legal cause as "proximate cause," and not actual or factual cause).

The duty of care "is anticipating reasonably probable injuries to probable victims." *Irvine v. Murad Skin Research Laboratories, Inc.*, 194 F.3d 313, 322 (1st Cir. 1999). "A person breaches the duty of reasonable care when his actions create reasonably foreseeable risks. A plaintiff, then, must show the foreseeable risks created by defendant's acts or omissions

in order to carry his burden as to the element of a tort claims." *Vazquez-Filippetti v. Banco Popular de P.R.*, 504 F.3d 43, 49 (1st Cir. 2007). An actor is negligent if he fails to exercise due diligence to prevent a foreseeable injury. *Malave-Felix*, 946 F.2d at 972 ("a person is liable for injuries that a prudent person reasonably could anticipate."); *see Rivera-Santiago v. United States*, Civ. No. 08-1266, 2009 WL 702235, at *3 (D.P.R. Mar. 11, 2009)(holding that "negligence ensues if the injuries could be foreseen or reasonably anticipated by a reasonable and prudent person.").

The duty of care may therefore be defined as an obligation to anticipate and take measures against a danger that is reasonably foreseeable. The Supreme Court of Puerto Rico has on various occasions noted that "the requirement of foreseeability is not limited to requiring that the precise risk or consequences have been foreseen," explaining that "the essential [matter] is that there be a duty to foresee in a general way the consequences of a *determinate* class [of consequences]." *Pabón–Escabí v. Axtmayer*, 90 P.R. Dec. 20, 25 (1964) (emphasis added).

The element of "reasonableness" is implicit in this passage, for even though in order to be liable for negligence a person need not foresee the *specific* consequences that did, in fact, result from a given act or omission, still, those specific consequences must fall within the *general class* of consequences that in a normal person's experience flow from such an act or omission. Herminio M. Brau del Toro, 1 *Daños y Perjuicios Extracontractuales* [*Torts*] pp. 184–185 (1986). Thus, the Supreme Court has stated that "[t]he lack of light in a stairwell, even if constitutes negligence imputable to the lessor, it is [negligence] in relation with the usual foreseeable risk of injury created by that type of dangerous

condition, such as slipping and falling, or tripping up against an object on the floor," and therefore held that the lessor was not responsible for a mugging on that same stairwell. *Estremera v. Inmobiliaria Rac, Inc.*, 9 P.R. Offic. Trans. 1150, 1156 (1980). To sum up, "[t]he norm of foreseeability is that the risk that must be foreseen must be based on probabilities and not on mere possibilities."*1 Daños y Perjuicios Extracontractuales* [*Torts*] at 185.

**B.    *Duty of Care in Hotels***

The normal rule is that a person does not have a duty to prevent an attack upon another by a third party, *J.A.D.M. v. Plaza Carolina Shopping Center,* --- P.R. Dec. ----, 1993 WL 839838 (1993), or by wild animals, P.R. Laws Ann. tit. 31 § 5144; *see also Woods-Leber, supra.*   In a number of cases, however, the Puerto Rico Supreme Court has established that certain types of institutions have a duty to protect certain persons from attacks by third parties. *Tormos–Arroyo v. Departamento de Instrucción Pública,* 1996 WL 498870 (P.R.) (Public junior high school's duty to protect students from criminals); *J.A.D.M. v. Plaza Carolina Shopping Center,* 93 J.T.S. 26 (Shopping center's duty to protect patrons from criminals); *Elba A.B. v. Univ. of Puerto Rico,* 125 P.R. Dec. 294 (1990) (University's duty to protect student from criminals); *Pabón–Escabí,* 90 P.R. Dec. 20 (Hotel's duty to protect guests from criminals); *Cruz–Costales v. Commonwealth of Puerto Rico,* 89 P.R. Dec. 105 (1963) (Public high school's duty to protect students from criminals). "In that sense a hotels--that basically substitutes a home--, a hospital and a school (not to mention more) are obliged to maintain a reasonable measure of security for the protection of their guests, patients and students, contrary to a contractor or a business whose scope

of activity does not encompass the need to provide said protection." *Estremera*, 9 P.R. Offic. Trans. at 1154.

After a plaintiff demonstrates that the defendant breached its duty of care, plaintiff must show that defendant's negligence was the proximate cause of his injuries. *Vazquez-Filippetti*, 504 F.3d at 49; *see Malave-Felix*, 946 F.2d at 972 ("one becomes liable, however, only if his negligence is the proximate cause of someone else's injuries."). Under Article 1802, proximate cause is defined in terms of foreseeability, which requires that a reasonable person should have foreseen the consequences of what actually occurred. *Vazquez-Filippetti*, 504 F.3d at 49; *Wojciechowicz v. U.S.*, 582 F.3d 57, 67 (1st Cir. 1999); *Malave-Felix*, 946 F.2d at 971-72; *Grajales-Romero v. Am. Airlines, Inc.*, 194 F.3d 288 (1st Cir. 1999). "To establish proximate cause, a plaintiff must prove that the accident was 'foreseeable and could have been avoided if the defendant had not breached its duty of care.'" *Wojciechowicz*, 582 F.3d at 67 (quoting *Grajales-Romero*, 194 F.3d at 296). In order for an event to be foreseeable, a reasonable, prudent person must be able to conclude from the evidence that "the risk complained of is among the universe of risks recognizable by reasonably prudent persons acting with due diligence under the same or similar circumstances." *Coyne*, 53 F.3d at 460. "A defendant's actions may only be the proximate cause of a plaintiff's injuries if they in fact caused the injuries and the defendant could have reasonably foreseen that the injuries would result from his actions." *Vazquez-Filippetti*, 504 F.3d at 49. "The action of the [defendant] must be judged against what a reasonable person, under the same or similar circumstances, would have done." *Wojciechowicz*, 582 F.3d at 67.

Furthermore, "[t]he question of proximate causation is sometimes for the court and sometimes for the jury. Not only ordinary fact questions, but also "evaluative applications of legal standards (such as the concept of legal 'foreseeability') to the facts" are properly jury questions. In any case where there might be reasonable difference of opinion as to evaluative determinations ... the question is one for the jury." *Marshall v. Perez Arzuaga*, 828 F.2d 845, 848–49 (1st Cir. 1987) (citing *Springer v. Seamen,* 821 F.2d 871, 876 (1st Cir.1987)). Considering the fact that in Puerto Rico there is no jury in civil cases, it is the federal law who must control the division of responsibility between a judge and the jury. *Id.*

**B.  *Assumption of Risk Doctrine***

On the other hand, Puerto Rico has adopted the concept of assumption of risk in actions for damages in its primary and secondary senses: (1) the primary sense--where there is a limited duty of care on the defendant's part; and (2) the secondary sense--which is actually a form of comparative negligence. *See Soto v. Tropigas de P.R.*, 17 P.R. Offic. Trans. 1035. The doctrine of assumption of risk is based on the common law thought which refers to "risks" as a relationship of free association between plaintiff and defendant, therefore, defendant's liability toward plaintiff is "limited." *Id.* at 1039; *see* James, Assumption of Risk, 61 Yale L. J. 141, 142 (1952).

"Puerto Rico is a comparative negligence jurisdiction. Art. 1802 specifically provides that the negligence of a plaintiff will not bar a tort-based claim but rather that the relief awarded shall be reduced proportionate to the degree of plaintiff's negligence." *Rivera Santiago v. United States*, 2009 WL 702235, at *4 (D.P.R. Mar. 11, 2009); *see Pons Anca*

*v. Engebretson*, 160 D.P.R. 347, 362 (2003). "It has been accepted that comparative fault in cases of negligence is the most reasonable and just way of imposing liability." *Montero Saldana v. Amer. Motors Corp.*, 1978 WL 48845 (P.R. May 31, 1978). Moreover, "[u]nder Puerto Rico's comparative negligence system, the jury can assess whether defendants' negligence caused the incident, whether plaintiffs' negligence caused [Dr. Holland's] injuries, or whether each side exhibited negligence that contributed to [said incident]." *Blomquist v. Horned Dorset Primavera*, 2015 WL 1894317, at *5 (D.P.R. Apr. 27, 2015).

Nonetheless, "[i]n *Echevarria v. Despiau*, 72 P.R.R. 442 (1951), the Supreme Court of Puerto Rico adopted the rule, and citing Professor Prosser, found the doctrine applicable to situations where the plaintiff, with full knowledge of the risk, enters into a relation with the defendant involving danger to himself. In such situations the plaintiff is said to act at his own risk and the defendant is relieved of liability." *Rubio v. S. Air Transp., Inc.*, 388 F. Supp. 1021, 1024 (D.P.R. 1975), *aff'd*, 539 F.2d 701 (1st Cir. 1976).

In the instant case, El Conquistador, argues, "the vast majority of the allegations of negligence are simply not true, and this summary judgment is warranted dismissing all claims premised thereon." Further, El Conquistador contends, "the remainder of the allegations concern omissions for which there was no duty to act to begin with and consequently summary judgment is also warranted". *See* Dkt. No. 127. Whereas, plaintiffs aver that El Conquistador breached the general duty of care it owed to its guests and clients by not providing basic safeguards to ensure their safety and wellbeing on January 1, 2013; and, in its failure to act with the reasonable prudence and attention that the circumstances demanded. *See* Dkt. No. 70.

There is no question that while Dr. Holland was engaging a snorkeling activity, he suddenly became unresponsive, and eventually died at the beach. The cause of death according to plaintiffs was drowning, and according to El Conquistador, a cardiorespiratory event due to an untreated heart condition. Additionally, if the Court were to assume that El Conquistador incurred on a negligent act, by preventing to take safety measures, the Court could find a causal relationship between El Conquistador's omission and the incident that resulted in Dr. Holland's death. El Conquistador evidently owed Dr. Holland a general duty of care and protection. However, the Court must determine whether there was a breach of duty of care from El Conquistador for failing to implement a lifeguard program and safety measures in Palomino Island until after the incident.

After a careful examination of the motions and the documents contained therein, the Court finds that plaintiffs have failed to provide evidence that made foreseeable that Dr. Holland's event was bound to occur. As previously stated, Dr. Holland was performing a voluntary recreational activity. It is a known fact that snorkeling is not merely swimming at the beach nor jumping small waves but a much more strenuous activity. Most critical, Dr. Holland suffered from several conditions that would endanger his health upon the performance of extraneous activities such as snorkeling, i.e., (1) untreated hypertension, (2) enlarged liver, (3) slight atherosclerosis, and (4) enlarged heart, to the point of almost double the size of a normal heart, and a thickened blood ventricle, among others. Thus, Dr. Holland decided to engage in a recreational activity

"with full knowledge of the risk, involving a potential "danger to himself." *See Rubio, supra.*

The Court finds that Dr. Holland, as a physician was capable of understanding the risks entailed in practicing recreational activities such as snorkeling. Moreover, during his snorkeling expedition of one (1) kilometer towards Palominito, he was accompanied by Mrs. Lisa Jassin, who has specialized training as a lifeguard, CPR and the use of an AED and who immediately helped Dr. Holland in the moments he was in distress at open sea. *See* Factual Findings ¶¶ 51-53, 59. The Court further notes that when the emergency situation occurred, Dr. Holland was approximately half way towards Palominito, that is, approximately 250 meters from the shore.[12] *Id.* ¶¶ 40-41. Consequently, the first aid provided to Dr. Holland by Mrs. Jassin, who was only 12 feet away, has proven to be much more effective than any help El Conquistador or a lifeguard could have provided Dr. Holland, considering his distance from shore at the time of the event. *Id.* Further, his head remained at all times above the water pursuant to the testimony of Lisa Jassin. *Id.* ¶ 62. Consequently, plaintiffs failed to meet the burden to establish a breach duty of care, as the Court will illustrate hereafter.

It is undisputed that the January 1, 2013, the National Weather Service bulletin submitted by plaintiffs as evidence there were strong currents in Palomino on the day of the incident, is inconsistent with the conditions described in Palomino on the day of the events. *Id.* ¶¶ 30-33. Although the bulletin projected waves of 10 to 14 feet, there is

---

[12] The total distance between Isla Palominito and Isla Palomino is 1 km (kilometers) and 84.66 meters. "Distance between Isla Palominitos and Isla Palominos". 2018. http://distancebetween.info/ isla_palominitos/isla_palominos. (26 September 2018).

undisputed testimony from plaintiffs' own oceanographer expert witness, Dr. Canals that the waves between Palomino and Palominito were about one to two feet only. *Id.* ¶ 35. The undisputed tidal change was approximately 1 foot, which is typical for the Palomino area. *Id.* ¶ 37. The undisputed westward current between Palomino and Palominito was 0.3 to 0.45 knots or 0.6 to 0.9 knots. *Id.* ¶ 38. It is further undisputed that the currents experienced by Dr. Holland were of 0.6 to 0.9 knots. *Id.* ¶ 87. Consequently, Plaintiffs cannot establish that the weather conditions in Palomino and Palominito on the day of the events were consistent with the weather bulletin. Thus, plaintiffs cannot establish a real hazardous condition at sea during Dr. Holland's expedition. As such, the Court concludes the conditions on Palomino Island on January 1, 2013 were consistent with engaging in snorkeling.

Moreover, as Dr. Holland rented his snorkeling equipment, he did not rent floatation belts, which were available in La Casa del Mar. *See* ¶¶17, 22. It is further undisputed that on the day of the incident, there were 12 to 15 belts available for rent. *Id.* ¶ 21. The Snorkeling Liability and Release Policy further demonstrates that two belts were rented after Dr. Holland rented the equipment for his party. *Id.* ¶ 23; *see also* Dkt. No. 58-1. Thus, the Court can conclude that when Dr. Holland rented his equipment he decided not to rent floatation devices, although they were readily available for rent and use. Plaintiffs have also failed to submit evidence that there was a duty from El Conquistador to provide floatation devices when practicing snorkeling. It is further undisputed that plaintiffs' own scuba expert, Alberto Marti, confirmed there was no rule, law or regulation requiring the use of floatation devices on January 1, 2013. ¶ 76.

As to El Conquistador's lack of lifeguard on duty, the Court finds that Mrs. Jassin, who has lifeguard, CPR and AED training was the *idoneus* person to aid Dr. Holland while he was physically distressed at open sea, as she was close to Dr. Holland when he became unresponsive. ¶¶ 51-54, 59. It is further undisputed that the first responder to Dr. Holland's emergency was Mrs. Jassin. *Id*. Plaintiffs have failed to submit evidence that proves Dr. Holland would have survived if first aid were provided by El Conquistador instead of Mrs. Jassin. Further, by the time Dr. Holland received assistance from the hotel personnel, CPR had already been performed by Dr. Laura Baum-Holland, Dr. John Ruge, and Dr. Armacost. ¶¶ 48, 63, 65. Moreover, a defibrillator was available at shore and used on Dr. Holland within approximately ten (10) minutes. ¶ 69. But, the Court insists that he was duly well attended prior to the use of a defibrillator by physicians Laura Baum-Holland, John Ruge and Melinda Armacost. There are no allegations nor evidence that such efforts were deficient. Further, pursuant to Dr. Ruge's testimony, Dr. Holland was already dead upon his arrival to the shore and before the need of a defibrillator.

Most critical is the determination of the Court as to whether the release form that Dr. Holland signed as he was renting the snorkeling equipment properly released El Conquistador from any type of liability concerning the instant claim. The Court must also determine whether the release signed by Dr. Holland properly certified that he did not suffer any mental or physical disease, illness or disability that "would render him unfit for snorkeling." *See* discussion, *infra*.

## C.    *Validity of Snorkeling Liability and Release Policy signed by Dr. Holland*

Plaintiffs stipulated that Dr. Holland signed the *Snorkeling Liability and Release Policy* produced by concessionaire, La Casa del Mar. Since the language of the waiver is critical to our analysis, the Court includes the release in its entirety.

**La Casa del Mar Dive Center**
**Snorkeling Liability and Release Policy**
**(Please Read Below Carefully and Sign)**

Medical History
I neither am nor have suffered from any mental and/or physical disease, illness, or disability that would render me unfit for snorkeling.
Release Liability
I fully understand that my snorkeling activity is at my own risk, and hear by [sic] release La Casa del Mar Dive Center, El Conquistador Resort, the subsidiaries, and it's [sic] employees. I also understand that I will hold them harmless from all claim, risk, damage, injury, and liability arising from any injury or illness sustained while engaged in snorkeling caused from any negligence or default of any other snorkelers.
Equipment
I hear by [sic] accept the equipments as follows: I agree that the use of such equipment is at my own risk. I shall return the equipment in good working order, the same way and complete as was received. I am also financially liable from any deviations, therefore, at the cost listed below:
Lost or Damage Mask…………..$60.00
Lost or Damage Snorkel………...$ 25.00
Lost or Damage Fin (each)……...$ 20.00
All rental equipment must be returned by 3:30. If returned late for any reason an additional charge of $10.00 per set will be applied. No exceptions!!!
Date: 1.1.13 (Emphasis ours).

*See* Dkt. No. 58-2.

"In assessing the validity of a waiver [Release], courts almost universally consider the following: (1) whether the person signing the waiver had informed consent; (2) whether the clause was inconsistent with public policy; and (3) whether the clause

constitutes an invalid adhesion contract." *Olivelli v. Sappo Corp.*, 225 F. Supp. 2d 109, 116 (D.P.R. 2002). In order for an informed consent to be met, "[i]t suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." *Id.* at 118.

Furthermore, "[i]n cases arising from hazardous recreational pursuits, to permit released claims to be brought to trial defeats the purpose for which releases are requested and given, regardless of which party ultimately wins the verdict. Defense costs are devastating. Unless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction." *Olivelli*, at 118 (citing *National and International Brotherhood of Street Racers, Inc. v. Superior Court*, 215 Cal.App.3d 934, 264 Cal.Rptr. 44, 46-47 (1989))(Emphasis ours). The Court also notes that a release must be "clear, concise and unequivocal" "as to put a person on notice of its legal significance and effect." *Olivelli* at 118.

After a thorough review of the *Snorkeling Liability and Release Policy* (Dkt. No. 58-2), the Court finds that the release complies with the requirements listed in *Olivelli*. The document releases concessionaire, La Casa del Mar and El Conquistador ". . . from all claim, risk, damage, injury, and liability arising from any injury or illness sustained while engaged in snorkeling caused from any negligence or default of any other snorkelers." *See supra.* Further, the release clearly states that the snorkeling activity is at the own risk of the person. The release further contains a certification that if signed, constitutes a guest's declaration that he has no physical disease, illness or disability that could prevent him from safely practicing snorkeling. The Court finds that Dr. Holland was a physician

who was fully aware or should have known as to the of the ramifications of signing a liability and release document, given that, physicians typically provide these types of documents to their patients prior to rendering treatment.

Moreover, when signing the document, Dr. Holland did not disclose that he suffered from several untreated conditions, hence, was at risk when engaging in recreational activities such as snorkeling. Among the conditions that Dr. Holland presented when his autopsy was performed was an untreated hypertension and an enlarged heart weighing 560 grams, almost twice the weight of a normal heart, as a result thereof; slight atherosclerosis; an enlarged liver of 3,080 grams, that is, 1480 grams larger than a normal liver, brownish-yellow and of hinged consistency, consistent with fatty liver; and obese in weight. ¶¶ 94-99. By signing the release document, Dr. Holland certified that he did not suffer from any physical disease that would prevent him from engaging in a snorkeling activity. However, the pathologist's findings during Dr. Holland's autopsy reflect that his physical condition was the complete opposite of what was attested by Dr. Holland in said document. *Id.*

Most critical and determinative, Dr. Ruge, the neurosurgeon who assisted Dr. Holland upon his arrival to shore testified that his first assessment as to Dr. Holland's condition upon his arrival to shore was that he was dead, totally cyanotic and blue. He was also pulseless and breathless.[13] ¶ 64. Thus, there was nothing additional that any

---

[13] No medical expert witness report was submitted by plaintiffs that could confirm plaintiffs' contention that Dr. Holland drowned as opposed to suffering a cardiorespiratory event while at sea, as suggested by defendants. The only medical information provided by the parties was the autopsy report, the transcript of the deposition of the pathologist and Dr. Ruge's testimony as to his assessment of Dr. Holland's condition upon his arrival to shore. ¶¶ 64, 92-105.

third party, including El Conquistador, could have done to prevent Dr. Holland's demise while engaging in snorkeling activity.

More importantly, the Court finds that regardless of Dr. Holland's cause of death, he effectively released El Conquistador from liability regarding the snorkeling activity he was engaging in prior to his demise. However, the Court notes that plaintiffs failed to submit evidence in the instant summary judgment request and opposition thereto that could prove that El Conquistador could have played a role or could be liable as to Dr. Holland's accidental death.

## VI.    CONCLUSION

It is well established that at summary judgment stage, the moving party bears a two-fold burden: it must show that there is "no genuine issue as to any material fact"; as well as that it is "entitled to judgment as a matter of law." Veda-Rodríguez v. Puerto Rico, 110 F.3d 174, 179 (1st Cir. 1997). It is equally well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prod., 530 U.S. 133, 150 (2000)(internal citations omitted).

Furthermore, at this stage of the proceedings, the Court must "draw all reasonable inferences in the light most favorable to [the non-moving party]." Vera v. McHugh, 622 F.3d 17, 26 (1st Cir. 2010). Even when doing so, the Court finds that summary judgment is warranted in the instant case as plaintiffs have failed to submit evidence that establishes a duty of care that was breached by El Conquistador. More importantly, Dr. Holland voluntarily signed the *Snorkeling Liability and Release Policy* prior to engaging in

a demanding recreational activity, wherein he affirmatively attested that he was in a physical condition that renders him fit to engage in snorkeling between two (2) islands that were one (1) kilometer apart from each other. Hence, regardless of Dr. Holland's cause of death, a release was effectively obtained and no breach of duty, law or regulation has been found by the Court. Consequently, the Court hereby **GRANTS** El Conquistador's motion for summary judgment.

For all the reasons elucidated herein, El Conquistador's motion for summary judgment at Dkt. No. 127 is hereby **GRANTED**. Judgment of dismissal is to be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, on this 30th day of September, 2018.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge